

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00171-CV

IN THE INTEREST OF S.D., JR., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-97991J-13

----------

## MEMORANDUM OPINION[1]

----------

After the death of her thirty-two-month-old son, Q, Mother was arrested and confined in jail. The Texas Department of Family and Protective Services (TDFPS) placed Q's younger brother, Q2, in foster care for a short time but then placed him with his maternal great-uncle and great-aunt T.J. and L.J. (the Js), who live hours away in East Texas, near Q2's other siblings. Mother delivered

---

[1]*See* Tex. R. App. P. 47.4.

another child, S.D. Jr. (Son), during her incarceration. TDFPS placed him in foster care upon his release from the hospital after his birth, but about two months later, TDFPS also placed him with the Js.[2] TDFPS filed a petition for termination and conservatorship of Son but ultimately abandoned its termination claim and sought to place the child in the joint managing conservatorship of the Js. After a trial, the trial court named Father and the Js joint managing conservators (JMCs) of Son but gave the Js the exclusive right to determine his primary residence instead of Father. The trial court gave Father standard possession and prohibited any visitation between Mother and Son. (Mother appeared at trial solely through counsel and is not part of this appeal.)

In one issue, Father complains that the evidence was insufficient to overcome the parental presumption in section 153.131 of the family code and to justify the trial court's naming the Js as JMCs with the exclusive right to determine Son's primary residence. Because we hold that TDFPS rebutted the parental presumption and that the trial court did not abuse its discretion by naming the Js as additional JMCs or by giving them the exclusive right to determine the child's primary residence, we affirm the trial court's judgment.

---

[2]The children discussed in this opinion are referred to as: "Q," the deceased child; "Q2," his younger brother; and "Son," their younger half-brother, who is the subject of this case. To improve readability, the opinion refers to these children by these letters and fictitious names throughout, even in quotations, without the use of brackets.

**Statement of Facts**

Father had a relationship with Mother for two to five years before the early 2014 trial on TDFPS's suit affecting the parent-child relationship (SAPCR) of Son. The evidence on whether the relationship was ongoing conflicted. Much of the trial focused on the death of Mother's son Q; Father's part in it, if any; his level of remorse; and any changes the event wrought in him.

### Q's Death

On the morning of June 20, 2012, after spending the night at Mother's apartment, Father lay in bed. He heard from another room Mother yelling and hitting her son Q with an unknown implement that made a "popping" noise. He heard Q crying. Q was thirty-two months old and weighed twenty-two pounds. Father testified that Q

> had this breathing thing, like, when his momma had whooped him. He had like a (indicating), like, you know, some kind of . . . I don't know what it was, but I asked her about it. She said, "He always do that. He do that so—getting at me, because he mad at me for whooping his butt." That's what she told me.

Father testified that the sound he described sounded like Q was having trouble breathing and that the sound began after Mother began hitting him. Q continued to cry for about fifteen to twenty minutes after Mother left for work. She left Q and her younger son Q2, who was about fifteen months old, in Father's care.

At around 10 or 10:30 a.m., Father got up to make breakfast. He testified that Q was no longer making the sound that sounded like he was having trouble

3

breathing.  Father sat Q2 in front of his bowl to eat and called Q to come eat but got no response.  Father testified that Mother had told him not to force Q to eat if he did not want to.  At that time, Q was lying on a pallet on the living room floor.  Father testified that it looked like Q was sleeping, which would not have been that unusual.  Father also testified that he thought that Q was probably asleep because he had finally stopped crying.  But Father did not go near him.  Instead, Father went back to bed and watched television.

About ninety minutes later, at "[e]leven something, close to twelve," Father got up to make sandwiches for lunch.  When lunch was ready, he called Q and went to where he was lying on the floor.  Father testified that only then did he see "the bruises and all that stuff on Q's back and the one on his forehead."  Father did not pick the child up.  In fact, Father testified that he never picked Q up:

> He's not my son, first.  I know her . . . baby daddy.  I don't even—
> you know, I don't—me and him, we know each other, so I'm not
> fixing to try to raise this man's kid.  I don't mess with him at all.  I
> don't—it's not like he was my son and I was interacting with Q or
> anything like that.  Me and Q, we wasn't—we didn't have that bond
> like that.

After noticing the marks on Q, Father went to the bedroom, texted Mother, and called the person with whom she had ridden to work.  Mother came home in fifteen to thirty minutes.  After Mother arrived home, she picked Q up.  To Father, "it just looked like he was just—like, dead asleep.  But it's like he was just limp."  Father testified that he then called 911.  He told Mother to put Q down.  Mother and her friend performed CPR on Q.  Father patted Q's face and noticed that the

4

child was not moving but did not notice whether Q was cold and did not check for a pulse because he did not know how.

The fire department report reflects that the 911 call was received at 1:10 p.m., that the emergency medical personnel arrived at the apartment four minutes later, and that Q was "cold" and "pulseless" when they arrived. The code blue occurred at 1:30 p.m., before Q arrived at the hospital. Medical records show that Q arrived at the hospital at 1:38 p.m. and was pronounced dead at 1:49 p.m. At thirty-two inches tall with a weight of twenty-two pounds, he was below the fifth percentile in both height and weight. He had abrasions on his left temple, physical bruises on the left side of his face, and at least eleven old scars on the buttocks, legs, and back. The medical examiner ruled the death a homicide caused by Battered Child Syndrome.

**Aftermath of Q's Death**

Mother was arrested for Q's death. Grand Prairie police interviewed Father about Q's death, but he was not charged.

Jeremy Dickinson, a Child Protective Services (CPS) investigative supervisor, investigated a referral concerning Q and Q2 after Q's death. The allegations were physical abuse, neglectful supervision, medical neglect, and emotional abuse. Dickinson explained that CPS was contacted when Q died after "severe physical abuse, and there w[ere] concerns for . . . how that occurred, as well as Q2 in the home. And that's when [CPS] became involved and investigated."

5

The disposition regarding the allegation of medical neglect against Father was reason to believe and was ranked "fatal": "[Father] was left as a caregiver for Q after he had been beaten by [Mother]. The child was with him from 8:30 a.m. to 1:15 p.m. He failed to seek any medical attention for this child knowing the child was having problems breathing." The dispositions regarding the allegations of neglectful supervision, ranked "serious," were also reason to believe for both Q and Q2 because police found a loaded handgun underneath the bed Father shared with Mother as well as drug paraphernalia.

Dickinson admitted that he had never interviewed Father or Mother regarding the dispositions and that he had spoken only with a police detective and other CPS workers who had spoken to Mother. Dickinson also admitted that he did not know who owned the gun.

Father denied any knowledge of the gun that was found under the bed he shared with Mother. He also testified that he had not been offered immunity to testify against Mother in any proceedings.

T.J., Mother's maternal uncle, testified that Mother, "people who were there at the apartments," and "Keisha Brown, the one that [first] called the police[,]" told him that Father had killed Q. T.J. testified that he still believed that Father had something to do with Q's death and "was involved": "[W]hether [Father] murdered Q or not, he sat there and let Q stay on the floor for five hours and did not call medical care for him." T.J. also still believed that there was a possibility that Father had murdered Q and that he would testify against Mother

6

in a criminal trial. T.J. conceded that Mother "played a part in" Q's death but stated that he did not know whether she was responsible for the physical injuries because he had no details of the injuries, despite his awareness that she had accepted responsibility for the injuries.

After Q's death, his little brother, Q2, was removed and placed in foster care. Soon thereafter CPS conducted a family conference (that did not involve Father or his family because they are not Q2's relatives), and Q2 was placed with the Js in East Texas.

Mother delivered Son in February 2013 while confined in jail. Kimberly Russell, an investigator for TDFPS, testified that a referral was received regarding Son on February 19, 2013, regarding neglectful supervision of the newborn based on Mother's incarceration for Q's death. Mother acknowledged to Russell that she was in jail for fatally injuring Q.

Russell discussed with Mother the need to place Son with "some possible relatives." Mother identified Father as Son's father, but TDFPS had concerns because of Father's CPS history regarding Q's death. Russell therefore made another disposition against him of reason to believe for neglectful supervision regarding Son. TDFPS assessed a risk of harm for Son in his parents' care solely because of what happened to Q. Son was removed from Father and Mother and placed in foster care.

Russell admitted that she knew at the time of Son's ex parte removal that "there were relatives in place" who would take Son, but she did not investigate

7

those relatives instead of removing the child and placing him in the foster care system because of the history with Q. Russell also testified that not asking the parents about voluntary placement with other family members is normal "[i]n cases like this."

Russell knew that Q2 had been placed with the Js and could have placed Son directly with the Js as a voluntary placement instead of placing the baby in foster care first. She testified that she did not know why she had not done so. Russell testified that Father's living with his mother (Grandma) at the time Son needed a placement weighed against placing the child locally with Grandma. Russell also did not investigate Father's two aunts, who live locally, before the ex parte removal.

Dwight Lack, special investigator for TDFPS, testified that he interviewed Father on February 20, 2013, two days after Son's birth. Lack discussed Father's criminal history, including aggravated robbery, with him as well as Father's relationship with Mother. Lack testified that Father reported that he and Mother had been in a relationship for two to three years and volunteered that he planned to continue the relationship.

But Father testified that he and Mother were not in a relationship when Son was born. He said that he continued the relationship after she went to jail and before Son was born because she was his son's mother, "and that was it." Father testified that he did not learn about the pregnancy until after she was already in jail.

8

T.J. testified that

the last time [they] were in court, [Mother] wrote [him] a two-page letter saying that she wanted [him] to stop and give in to the case and let [Son] be with his father, because whether she got 10, 20, or 30 years, they were going to be together when she got out.

Father testified that he had planned to raise Son before TDFPS took him from the hospital instead. Father had bought "everything" and had planned to live with Son and Grandma in her house. Grandma would play a supportive role. But Father testified that he understood why CPS opened a case regarding Son and understood their concerns. He stated, "It's all about the child safety. That's the most important thing."

Two months after the removal, TDFPS placed Son with the Js, who were raising his half-brother Q2.

Mother pled guilty to injury to a child in November 2013, when Son was about nine months old, and her sentencing was pending when this trial in family court occurred.

**Evidence of Father's Responsibility and Remorse for Q's Death**

Father claimed at one point that he had never hit Q but later admitted that he had "popped" him on one occasion. Father also testified that he had seen Q about ten times before his death but had never talked to him. Father had also previously been left alone with the children for half-days. He testified that he had heard Mother spank Q maybe two or three times before the day Q died. But Father claimed that he did not realize that Mother had been beating Q when he

9

had potty training accidents and that "[e]verybody knew Q had a problem but [Father.] [Father] didn't know any of that." Father denied seeing vomit on Q's pallet or anywhere else in the house but admitted that he had seen feces on the barstool on the morning of Q's death and on the carpet previously.

Father testified that he had had no idea that anything was wrong with Q when he saw him on the day of his death:

> If I—I mean, knowing what I know now, you know, that's—I can always say I would have did something differently. But right then, at that moment, I didn't know it was that severe. I didn't know Q was in danger. I didn't know he needed my help. I didn't know any of that.

He also testified that he accepted some responsibility for Q's death:

> I should have—I mean, back then, where my life was and where it's at now—back then I was—I wasn't focused on Q . . . —and I kind of missed that because I was more in tuned to what I was getting from his mother, and I wasn't, you know—wasn't really worried about him, and I should have been. I should have been—as a man, I should have been knowing what's going on in the household at all times, and I wasn't that. I wasn't there in my life.

But a few minutes later, he disagreed that his inactions contributed to Q's death:

> A. I disagree.
>
> Q. Okay. In what way?
>
> A. All ways. I had—
>
> Q. Okay. Could you explain please?
>
> A. —no control over that. I can't—like, I can't control what somebody else would do. I can only control me. That's the best I can tell you. I don't even understand why you would even ask me something like that. I didn't understand the question at all.

10

Q. Okay. Well, let me ask a question you understand. Do you agree—or what is your opinion on whether your failure to help Q that day contributed to his death? I just want your opinion.

A. I don't think so because for the simple fact, I didn't know anything until after everything was done. So I couldn't have stopped her or anything. That's just her—this is her child. I had no idea on, you know, that I would have to—I don't know. I just don't know. I don't think so. I disagree with what you said, though.

Later, on direct examination, he testified that he regretted what happened to Q. He said that if he had it to do over again, he would have called the police before anybody else. He testified that he would also know more about what was going on in the house than he did with Q. "That's most important to me. That's what I got out of all this: You know, hopping in and out of relationships and not knowing—I would be more focused on the house and what's going on around me."

Tanae Todd, CPS conservatorship worker, testified that she was also the caseworker on Q and Q2's case, which was still pending when Son was born. When she received Son's case, she "was concerned about what [Father's] role was in the death of Q and his plans to continue a relationship with [M]other."

Todd testified that when they spoke in July 2013, which was around six months before the trial began, Father told her that he "wasn't really watching Q on that day [Q died,] . . . he didn't really feel like he had a responsibility to because they weren't his children," and he and Mother were not "in a relationship." It was more of a casual, sexual pairing. Despite some of his

11

testimony indicating otherwise, Todd still believed that Father believed that he did nothing wrong that contributed to Q's death.

On the other hand, Father testified that he had told Todd "countless times" what he had "done wrong that day" and also testified that he did not believe that he could say or do anything to convince her because her mind was made up that the Js should have custody of Son before Father's service plan was even created.

Grandma testified that Father told her that "he wished he would have called for help versus call[ing] the mom first." Grandma admitted that she had "told him [her]self that [she] would have called 911 first, but [she's] had dealings with babies and stuff." She also testified that she heard that CPS "said that he wasn't remorseful, and that's not what [she has] seen." Grandma admitted that she understood the Js' concern that Q had died on Father's watch.

**Father's Service Plan**

Father's service plan requirements included visiting with Son, having and maintaining a job, having a safe household, and completing parenting classes, counseling, and anger management. Father believed that he was ordered to complete services because of the circumstances surrounding Q's death and his own background. He admitted that he did not understand why anger management was required but completed it and the rest of his plan successfully.

Todd testified that CPS wanted Father to take anger management classes because of the aggravated robbery, "and just the way that the [July 2013]

12

conversation was going between [them] at that time kind of showed that there may have been a reason for him to have anger management as well." Father yelled but finally calmed down.

Todd admitted that one reason that Father was upset was that he had a hard time reaching her, and she also admitted that she had met with him only twice outside of hearings. Grandma and Father both testified that they had trouble reaching Todd during the case. Grandma testified that she left many messages, but Todd never responded unless "she wanted a question answered." Eventually, Grandma gave up trying to contact her.

But Todd testified that Father was not just upset at not being able to reach her; he was upset about many tasks in the service plan, including the anger management requirement. She further testified that she had had trouble reaching Father by phone and that she "had called him for all of June and most of July." Todd explained to Father in their July 2013 conversation that TDFPS's

> biggest concern was that he hadn't accepted responsibility for his role in Q's death, that whether or not he's the one that actually caused the injuries, that him not [sic] seeking medical attention could have probably saved Q's life, and that[] [TDFPS's] biggest hurdle is getting him to understand that, and that he could address that in counseling to help him get to a place where he could understand that . . . .

Father testified that he performed whatever TDFPS asked of him because he wants to raise his son and will "do whatever." He also testified that he felt like he had done whatever he needed to do.

13

Father worked Monday through Friday at an auto parts store and at trial, had been working there almost a year and a half. He had his own apartment and car (but no valid driver's license), and he had been looking into daycares.

Father stated that he learned in counseling that adults

> are the voice for children. You know, sometimes children can't tell you when they being hurt or when they being neglected or mistreated. As an adult, you know, it's our jobs to watch out for them and protect them. And, you know, sometimes you got to be the whistleblower, you know. If you seeing something going on that ain't supposed to be, you got to step up as an adult and, you know, put a stop to it, no matter if it's your child or not.

Father also discussed what he had learned in parenting classes:

> I know, like, when a child is developing properly. I know the importance of socializing the child and having them around all your family and stuff like that, you know. And I learned that the way that I [was] raised up, like when the women—I mean, the teacher . . . was telling us, you know, the way we was raised necessarily ain't the way children need to be raised today, that children are different. Children —they need more explanation, instead of just telling them what to do, like we was taught, you know.
>
> She taught us to be more interactive with our kids and take more responsibility and more charge over their life and have them doing something constructive and consistent on a consistent basis. Kids need structure and consistencies in their life.

Father testified that he had never injured Son. He also testified that he had not used illegal drugs and had had no arrests, charges, or convictions since he had found out that Mother was pregnant with Son.

Todd had concerns about whether Father took advantage of all his visitation time with Son. T.J. testified that he had given Father more time with Son than TDFPS required. T.J. also stated that the visitation agreement with

14

Father was that T.J. would bring Son to Father's family whenever he was preaching in Dallas and would meet Grandma in Canton on alternate months for her to pick Son up and drop him off, but Father would visit Son in T.J.'s East Texas home in the remaining months. Father never went to East Texas to visit Son. Father also never accompanied Grandma to pick the child up in Canton. T.J. had seen Father only three or four times, and that was in court or at a TDFPS–run family conference.

Father explained that he never went with Grandma to pick up Son because Father worked on Saturdays. Father testified, however, that he paid for Grandma's gas when she picked up and dropped off the child. But Father admitted that he had never called the Js' home and had never written a letter to Son for the Js to read to Son. Father stated that he had not tried to arrange visits because "it was set up for [Grandma] and [his] aunt to, you know, mediate that part of the visitation . . . ."

Grandma testified that the visits ended up being only once a month instead of twice monthly because "that's the only time [the Js] would make arrangements with" her; "[t]hey were busy, they were going out of town[,] or they had a funeral or something[.]"

Even though Father completed his service plan, Todd believed that CPS's goals for individual counseling were not met because of his "issues understanding [TDFPS's] concerns and what he was supposed to have learned from the counseling services about accepting responsibility completely, you

15

know, making better choices." She also had concerns about whether he was honest with his counselor because, according to Todd, the time frame Father gave his counselor of Q's last day did not match the time frame he had given TDFPS. Despite any benefits that Father had gained from completing his services, Todd did not believe at trial that he "would be able to safely parent on his own."

**Son's Present and Future**

T.J., who had also been Mother's primary caregiver, testified that he lives about two and a half hours from Fort Worth and that Son had been in his home about eight months. Upon learning of Mother's pregnancy with Son, T.J. had contacted CPS to ask about adopting him. At trial, the Js were in the process of adopting Q2. Mother's other two children live in East Texas as well, so Son sees them "every week or two."

T.J. testified that Son is doing well, "really kind of above target." He and Q2 attend a child development center from 8 a.m. to 5 p.m., Monday through Friday. Todd, in response to Son's attorney ad litem's questioning, testified that she had not visited the daycare but had no concerns about it. She said that it "has a learning program for small children" that she had heard was "really good."

L.J. works while the children are in daycare. T.J. is a pastor at two churches, but he takes the children to their medical appointments and runs the family's errands. T.J. testified that he can meet Son's needs. He draws disability

16

and a pastor's salary, and L.J. has a salary. Each child has his own bedroom and TV. The house has a big yard.

T.J., who was fifty-one years old at trial, is an insulin-diabetic and has no feeling in one of his hands or one of his feet. He testified that the lack of sensation does not affect his everyday life, but he admitted that he cannot "hold onto real well" with the injured extremities and that he has trained himself to do things with his left hand that he used to do with his right hand. T.J. also testified that his health problems do not make caring for Son more difficult and that L.J. is in good health.

T.J. testified that he wants to be Son's permanent managing conservator (PMC) because he thinks that is best for Son. He and his wife love Son, they are the only parents that he has known, they have a nurturing home, and they want to provide him a good education and a religious upbringing. T.J. stated, "I think it's better if he's a little more sheltered and guided and nurtured." T.J. also planned to continue the relationship among the four siblings as well as with the baby's paternal family. But he believed that Son needed to remain with L.J., Q2, and him.

T.J. had no idea whether Father would physically harm Son:

> I don't know anything about [Father]. I don't know how he acts when he gets mad. I don't know. I don't know how he acts when he gets rattled. That's for somebody else to decide. I don't know.
>
> . . . .

17

Q. . . . You don't know how he would react if he was angry. What do you fear he might do?

A. Maybe an out-of-control situation. I honestly don't know, but I understand that things have went on in the past, and no one knows. No one knows.

T.J. admitted that he had once been charged for committing assault family violence against Mother's mother, a transient drug addict. She refused to leave their mother's home, so he "pulled her off the porch and out of the yard." The charge was dropped.

T.J. said that it would be fine if the trial court awarded visitation to Father and that he would "do whatever it takes" to comply. But he also thought that weekends once or twice a month and a month in the summer would be enough visitation and would prefer that the visits be supervised.

T.J. had nothing but good things to say about Grandma, with whom Son stayed for his supervised visits with Father.

T.J. did not believe that his low opinion of Father or Father's potential testimony against Mother in a criminal case regarding Q's death would negatively impact any co-parenting with Father. T.J. testified that he would not have to be a part of the relationship, just drop off and pick up Son.

Todd had no concerns about the Js' ability to satisfy Son's needs now and in the future. She believed that the couple has done a good job of taking care of his medical needs as well as ensuring his connection with siblings and his paternal relatives by traveling back and forth. Todd also testified that parents

18

who do not talk to each other can nevertheless make sure that the children have relationships with both parents. She further testified that she had no concerns about T.J. bad-mouthing Father to the child and that she did not think she had any concerns about Father bad-mouthing T.J. to the child. She requested that the trial court name the Js as PMCs of the child because she did not think that Father was "ready to parent by himself" and believed that leaving the child with the Js would be the "the best and the safest option for him." Todd believed naming the Js as PMCs would be in the child's best interest.

But Todd also recommended that Father have visitation with the child, although the terms of those visits varied throughout her testimony. She originally testified that he should get possession for one or two weekends a month and extended time in the summer. She was against standard visitation initially because Father did not have a valid driver's license, unless someone else would be designated to transport the child. She also believed that Father could have short, two-hour visits with no supervision but was not so sure about unsupervised weekends. But on cross-examination, she testified that she would be okay with a standard possession order if Father's driver's license issue was taken care of. Upon questioning by Mother's lawyer, Todd changed her mind again and stated that Father should only have unsupervised visits that lasted two hours but that days and overnights should be supervised. When Son's attorney ad litem questioned her still later, she testified that Father currently did not have unsupervised contact and that she and TDFPS both believed that he was not

19

prepared to have unsupervised contact at that point. She clarified that Father's extended summer possession could include "maybe four or five hours at a time" of unsupervised possession but that "overnights and things like that should still be" with Grandma. For Todd to feel comfortable with Father having increased unsupervised time, he would need to

> [b]e able to have a better understanding. [Todd did not] know what that would look like, but just in conversations on the surface, he says the right things, but when you start asking him more questions, [she does not] think he gets it still, and if [she and Father] . . . can get to that point where he truly understands and can truly articulate, whichever way the question is posed, that he understands that something should have been done differently or that he could make better choices, [TDFPS] would be at a different choice.

Todd admitted that nothing Father could do "[i]n the immediate future" would make her comfortable with him getting unsupervised time but testified that "further down the line," he "would be able to show that he could have [it]."

Todd conceded that Father had made some progress in how he interacted with Son and that Father

> came to a better understanding of some of the choices he made in the past as far as relationships with women and using women, but addressing the specific concern about his role in the death of [Q, she did not] think that he really made as much progress as [she] would have liked to have seen.

Similarly, she "still would question his judgment[] because he still doesn't think that he could have done anything differently that day that Q passed away, and that would make [her] question his ability to make good judgments in the future."

20

She pointed to his having a suspended driver's license as evidence of poor judgment.

Father admitted that he drives himself to work without a valid license. He testified that to regain his driver's license, he would need to pay three insurance tickets and surcharges, about $2,500–$3,500 total. He had known about his suspended license at least since the beginning of the SAPCR.

Todd also worried that Father's plan was to continue his relationship with Mother. Todd remained concerned at trial that Father does not understand how to be protective or what to do to be protective of a child.

Todd further testified that the appointment of either parent would significantly impair the child's physical health or emotional development. On cross-examination, however, she agreed that placing Son with Father would not significantly impair the child's physical health. She conceded that only Son's emotional health and development would be affected. When questioned by Mother's lawyer, Todd testified that what Father has done to demonstrate a threat to the child's safety is:

> I think he's showing a pattern of being passive or nonchalant and not really understanding simple things. Some of it was common sense to most people about how to protect a child. I think that that is a threat to the safety of this child. I don't—and he's demonstrated that by even just accepting partial responsibility, and then when he was on the stand, he was asked if he thought he could have done anything differently, and he said no.

Additionally, Todd testified that Father has not appeared that interested in Son when she has seen them interact. Nevertheless, Todd stated that she

21

believes Father loves Son and wants to care for him "somewhat." She further believed, however, that Grandma would be the primary caretaker if Father got primary custody, not Father. The trial court judicially noticed that if TDFPS had completed a home study of Grandma and placed the child with her in the beginning, then Father would not be asking for a placement change at trial. Todd had concerns "that he's not really committed to parenting by himself" and that "taking [the child] from a safe and stable environment where he's placed with siblings and he's close to his other siblings, to place him with [Father] who would end up having him live with someone other than a parent" "would be more damaging than to leave him where he is and to have [Father] have visitation and access to him."

Todd averred that placing the child with Father would essentially be moving the child from one nonparent placement to another, due to her concerns that Grandma would really be the caretaker, not Father. When questioned by Son's attorney ad litem, Todd emphasized that Grandma was "the one that was kind of driving [Father] and not really him on his own" when it came to the case and interacting with the child. Similarly, T.J. testified that he had noticed that Grandma, not Father, gave Son the most attention when they all appeared at various court proceedings.

Father testified that he loves Son and intends to raise him himself, not Grandma or his brother or his aunt. Father testified that he and Son bond on their visits:

22

> We play all day. I put him to sleep. He wakes up on my chest. You know, just little stuff like that. It's been something new. I have never—it's a whole different feeling for me because I've never been responsible for anybody or anything else, and just to see my son like that . . . .

Father further testified that when Son is with him, Father takes care of the baby, including diaper changes. Grandma also stated that during visits, Father changes the baby, they make videos, and Father spends all the time he can with him. She denied that Father was passive or nonchalant with Son.

The evidence of Father's financial support of Son conflicts. T.J. at first denied that Grandma had given him things from Father for the baby. He later conceded that she brought a pack of diapers "[l]ike every other month" and had given him $50 in August, but he did not know if the diapers were from Father or not. He denied receiving any toys or clothes for the baby, even after Christmas. Grandma, however, testified that she took a "big bag of Pampers" every visit and gave L.J. money every visit except the single time she gave the money to T.J. Grandma also testified that she took clothes and food each time. She additionally testified that she bought Son a toy and outfits for Christmas and that the Js took those gifts home with them. Finally, she said that she and Father provided the funding for all these things. Father likewise testified that he had bought diapers and had sent diapers and money with Grandma to give the Js for Son's care.

But T.J. was puzzled that Grandma had suggested that the weekends she got paid would be better for her to host Son's visits to the metroplex.

23

If Father were awarded custody, he planned to continue working days, Monday through Friday, while Son would go to daycare, and Grandma would drop him off and pick him up. In the long term, Father wanted his son to go to college, "be a good, strong man," and have a better future than Father had.

Father stated that Grandma would help him in any way necessary with his son, including picking him up from daycare if necessary or feeding him if Father was stuck in traffic. He admitted that he would need his mother for transporting Son.

Grandma agreed that she would play a supporting role, helping Father do whatever he needed to take care of his son, such as providing transportation or taking the child to doctors' appointments. Grandma had raised four sons, she's a mobile operations manager at Carter BloodCare, where she has worked for nineteen years, and she is a pastor. She married her current husband about twenty-five years before trial, when her youngest son was three. She and Father live six to ten minutes apart, depending on the weather. She testified that since the case started, Father had grown up a lot and had "been jumping through hoops for somebody other than himself." Grandma testified that Father "wants to be a father to his son and raise him, and [she] wanted to see him do that. If [Father] wasn't going to be the baby's father and be there in his life, [she] would be visiting with the [Js], because [she's] not trying to raise another baby." Grandma had no concerns about Father's ability to parent his son.

Father testified that he has an excellent support structure in Pleasant Grove—Grandma, his brothers, aunts, and uncles and his own grandmother. Grandma and two of Father's brothers knew the baby, and Father's two aunts visited him. Father stated that the family routinely got together at Grandma's house every Sunday.

Father admitted that it is important for Son to have a relationship with Q2. He also testified that he "value[s] the relationship that" the child has with the Js and would maintain it.

But Father testified that the Js had never spoken to him personally and that there was hostility between them and him. He claimed,

> I don't have any problems with them. I don't even understand why they upset with me. I don't even know. I don't know where all this hostility is coming from. I don't know why they feel the way they feel about me. I don't have any hard feelings towards them.

Father testified that T.J. has "had an attitude with" Father "[f]rom day one." But Father also testified that he appreciates T.J.: "It takes a special kind of person to take a kid up into [his] house and raise [him] like [he is his] own. I appreciate him for it greatly." Father further testified that despite the relationship between T.J. and him, Father is "open and willing to [do] whatever and [is] going to do whatever, regardless of how [T.J.] feels about it[,]" to improve the relationship because he realizes that that relationship will affect Son.

Grandma admitted that the communication issue between Father and T.J. was both men's faults.

25

**Father's Issue**

Father contends that the evidence was legally and factually insufficient to overcome the parental presumption and to name the Js as JMCs with the exclusive right to determine Son's primary residence and that the trial court therefore abused its discretion by placing Son with the Js. When determining the issues of conservatorship, possession, and access to a child, a trial court shall put the child's best interest first.[3] But the parties vying for the rights of conservatorship, possession, and access are not always treated equally.

**Rebuttable Presumptions**

Section 153.131 of the family code provides,

> (a) Subject to the prohibition in Section 153.004, ***unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator*** or both parents shall be appointed as joint managing conservators of the child.

> (b) ***It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child.*** A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.[4]

Section 153.004(b) provides,

---

[3]Tex. Fam. Code Ann. § 153.002 (West 2014); *Danet v. Bhan*, 436 S.W.3d 793, 796 (Tex. 2014).

[4]Tex. Fam. Code Ann. §153.131(a)–(b) (West 2014) (emphasis added).

26

(b) The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect . . . . ***It is a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child or as the conservator who has the exclusive right to determine the primary residence of a child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present child neglect . . . .***[5]

"[T]he acts or omissions listed in chapter 261 [of the family code] might be used to inform the terms' use in other chapters. Under chapter 261, neglect may include in part the failure to seek, obtain, or follow through with medical care for a child."[6] "[N]eglect [also] includes . . . failing to remove a child from a situation that requires actions or judgment beyond his capabilities and that results in a substantial risk of immediate harm to the child."[7]

The evidence proffered by TDFPS was evidence of Father's neglect of Q. Father's evidence that he had no idea of the ongoing abuse Q was suffering or that Q was in distress the day of his death until it was too late is some evidence that he was not neglectful. Thus, both sides put on evidence regarding the two presumptions. As this court has previously explained,

A rebuttable presumption shifts the burden of producing evidence to the party against whom it operates. Once the burden is discharged

---

[5]*Id.* § 153.004(b) (emphasis added).

[6]*In re S.M.R.*, 434 S.W.3d 576, 583 (Tex. 2014) (citations and internal quotation marks omitted).

[7]*In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013) (citations and internal quotation marks omitted).

and evidence contradicting the presumption has been offered, the presumption is extinguished and shall not be weighed or treated as evidence. Furthermore, the presumption has no effect on the burden of persuasion.[8]

When the parental presumption is negated and therefore has no effect, the original rule again governs the case, and "[a]ll that must be shown by a preponderance of the evidence is that the appointment of the non-parents as [JMCs] would be in the best interest of the child."[9]

The judgment contains the following findings,

The Court finds that the appointment of . . . [Father] as sole managing conservator of the child, or the appointment of . . . Mother . . . and [Father] as joint managing conservators of the child is ***not in the best interest of the Child because the appointment would significantly impair the child's physical health or emotional development.***

The Court finds that the appointment of . . . [Father] as sole managing conservator of the child, or the appointment of . . . [Father] as the conservator who has the exclusive right to determine the primary residence of the child is ***not in the best interest of the child because credible evidence was presented of a history or pattern of past or present child neglect*** or physical abuse by . . . [Father] directed against a child. [Emphasis added.]

---

[8] *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 489 (Tex. App.—Fort Worth 1999, no pet.) (citations omitted).

[9] *In re Marriage of Preston*, No. 10-08-00066-CV, 2008 WL 5396967, at *1 (Tex. App.—Waco Nov. 19, 2008, no pet.) (mem. op.); *see In re W.A.R.*, No. 10-06-00165-CV, 2006 WL 3759189, at *4 (Tex. App.—Waco Dec. 20, 2006, no pet.) (mem. op.); *In re W.H.M.*, No. 01-00-01396-CV, 2003 WL 22254713, at *7 n.3 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.).

The trial court therefore made the required statutory findings to overcome the parental presumption and to support the rebuttable presumption that it was not in the child's best interest to live with Father.[10]

TDFPS argues that Father presents nothing for review because he neither challenges the finding under section 153.004(b) nor contends that he should prevail absent the parental presumption of section 153.131. It is true that Father does not mention section 153.004(b) in his brief. But because Father challenges TDFPS's neglect evidence—evidence that both erases the parental presumption and gives rise to the section 153.004(b) presumption against his being named the conservator with the exclusive right to determine the child's primary residence, and because he also offered some evidence contrary to that rebuttable presumption against him, therefore erasing that presumption, we shall reach the ultimate question in this case. That is, because each party offered evidence against the presumption favoring the other party, both presumptions disappear, and we review this case with all the parties on an equal footing.[11]

**Burden of Proof and Standard of Review**

As we have previously explained,

> The burden of proof in conservatorship cases, as opposed to termination cases, is a preponderance of the evidence. The standard of review in conservatorship cases is abuse of discretion.

---

[10] *See* Tex. Fam. Code Ann. §§ 153.004(b), .131(a)–(b).

[11] *See Preston*, 2008 WL 5396967, at *1.

The trial court has wide latitude in determining the best interests of a minor child. We will reverse the judgment of the trial court only when it appears from the record as a whole that the court has abused its discretion. A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to guiding principles. An abuse of discretion does not occur as to factual matters as long as some evidence of a substantive and probative character exists to support the trial court's decision. Legal and factual sufficiency are not independent grounds for review in conservatorship cases, but they are relevant factors in deciding whether an abuse of discretion occurred. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? The traditional sufficiency review comes into play with regard to the first question. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision.

The trial court did not file any separate findings of fact and conclusions of law supporting its ultimate conservatorship finding in the decree. When no findings of fact or conclusions of law are filed in a bench trial, the trial court's judgment implies all findings of fact necessary to support it, but these implied findings are not conclusive. An appellant may challenge them by raising both legal and factual sufficiency of the evidence points.[12]

**Best Interest Analysis**

Courts may use a nonexhaustive list of factors to determine the child's best interest.[13] Those factors include

(A)     the desires of the child;

---

[12]*In re W.M.*, 172 S.W.3d 718, 724–25 (Tex. App.—Fort Worth 2005, no pet.) (citations omitted).

[13]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[14]

Son was too young to express any desires about where he wanted to live. The record shows that the Js were meeting all his present emotional and physical needs and were prepared to meet them in the future. The evidence was conflicting on Father's contribution to Son's financial needs, and there was no evidence that he contributed anything to Son's emotional needs when Son was not physically with him in the metroplex, but there was evidence of the opposite—Father did not write, did not call, and did not visit Son in his East Texas home or accompany him on drop-offs or pick-ups.

No evidence of present or future danger with the Js was admitted, and no physical danger regarding living with Father was discussed; Todd explicitly

---

[14]*Holley*, 544 S.W.2d at 371–72.

31

testified that she was not worried that placement with Father would impair Son's physical health. But there was evidence that placement with Father would impact Son's emotional health. Placement with Father would have meant removing Son from the home that he had spent most of his life in, taking him from the parental figures that he had seen every day for most of his life, and separating him from his siblings, one in the home and two nearby. While Father testified that he would maintain those relationships if Son were placed with him, Father's never having gone to East Texas could have been a compelling fact to the trial court. Additionally, while there was evidence that Father had matured after Son's birth, his decision not to timely take care of getting his driver's license renewed was some indication that he was not yet prepared to take care of himself as well as a toddler. Further, the trial court could have had legitimate concerns regarding Father's involvement in or ability to have prevented Q's death, given the length of Father and Mother's relationship, the fact that he had "supervised" her children before, and the presence of older scars on Q. The trial court could have properly inferred that Father knew what was going on and did nothing to stop it or report it. Father's on-again, off-again absolution of himself for any responsibility is disturbing as well. Finally, the evidence, although conflicting, that Father and Mother were still together could have also been dangerous for Son in the future should the trial court have placed him with Father.

The Js have more experience with parenting, but Father completed his parenting classes and took care of Son when supervised at Grandma's house. Father had never cared for Son unsupervised. Both the Js and Father have extended family support, and daycare is available to both. There was evidence that the Js' home is stable.

The trial court's judgment did not give Father the sole custody that he wanted, but it awarded more rights and, particularly, possession and access to Father than TDFPS advocated. Considering all the evidence, we cannot conclude that the trial court abused its discretion by naming the Js as additional JMCs or by giving them the exclusive right to determine Son's primary residence. We overrule Father's sole issue.

**Conclusion**

Having overruled Father's sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED:  November 20, 2014

33